IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BILLIE HARRIS,

     Plaintiff,     CIV. S-02-2436  KJM PS

   v.

DONALD WINTER, SECRETARY,
U.S. DEPARTMENT OF THE NAVY,

     Defendant.
_____/

BILLIE HARRIS,

     Plaintiff,     CIV. S-02-2440 KJM PS

   v.

DONALD WINTER, SECRETARY,
U.S. DEPARTMENT OF THE NAVY,   FINDINGS OF FACT AND
                CONCLUSIONS OF LAW

     Defendant.
_____/

/////

/////

/////

1

Pending before the court are cross-motions for summary judgment. Upon review of the documents in support and opposition, upon hearing oral argument, upon review of defendant's proposed order and careful consideration of plaintiff's objections thereto, and good cause appearing, THE COURT FINDS AS FOLLOWS:

I.   FINDINGS OF FACT

    A.   Background and Definitions

    1. These two federal employee Title VII employment discrimination suits arise from two administrative EEO complaints filed to challenge employment actions at two Naval Shipyards, the now-closed Mare Island Naval Shipyard and the Puget Sound Naval Shipyard.

    2. The suit filed first in this court, 2:02-CV-S-2436, concerns a September 1994 suspension at Mare Island Naval Shipyard (MINSY), located in Vallejo, California. This first suit is called here the "Mare Island" or "2436" suit. The 2436 suit involves a two-day suspension the plaintiff received as discipline while working at MINSY.

    3. Attached to the complaint in the 2436 suit is a Department of the Navy final order and right-to-sue notice in the Mare Island administrative EEO proceeding, which had Department of the Navy number 95-00221-014.

    4. The suit filed second in this court, 2:02-CV-S-2440, concerns failures to hire at Puget Sound Naval Shipyard, in Bremerton, Washington, starting around November 1, 1995. This suit is called the "Puget" or "2440" suit.

    5. Attached to the complaint in the Puget suit is an Equal Employment Opportunity Commission decision and right-to-sue notice in the Puget administrative EEO proceeding, which had Department of the Navy number 96-00251-031.

    6. Both parties submitted exhibits in support of the pending motions. Plaintiff submitted exhibits identified by Arabic numbers, and defendant submitted exhibits identified by letters. Exhibits are cited accordingly below.

B.     The DOD Priority Placement Program

7.   The Department of Defense (DOD) Priority Placement Program (PPP) is an internal DOD program designed to assist civilian employees of the military services whose jobs are lost through reduction in force (RIF), as happens with base closure, to find a new position at another DOD facility.  It is characterized by a mandatory requirement to hire qualified employees from the DOD PPP registry before any outside applicants can even be considered.  See generally Ex. 6.  Only if there are no PPP registrants referred for and qualified for a vacancy can a DOD facility hire from outside of the DOD PPP.

8.   The Department of Defense created and runs the Priority Placement Program. By internal DOD rules, every military service activity must participate and must follow DOD direction.

9.   The PPP registry is a list of DOD employees who meet the requirements for assistance under the PPP.  This list is maintained electronically, and it is maintained exclusively by the DOD.  The DOD PPP electronic records are the definitive source of information on PPP registration.

C.     The MINSY Claim

10.  In 1994, plaintiff was a Rigger Supervisor, WS-5210-10.

11.  A Rigger is a skilled tradesperson responsible for planning and conducting the lifting of heavy loads by cranes and other heavy lifting equipment.

12.  The "WS" identifies plaintiff's position as being in the Supervisory Pay Schedule, a part of the Federal Wage System.  See Prevailing Rate Systems Act, 5 U.S.C. §§ 5341-49.

13.  MINSY closed in 1996.  Before its closure, MINSY's mission was the maintenance and repair of U.S. Navy ships and submarines.  This is complex industrial work, and to carry out this mission, MINSY had various organizations that included permanent "Trade Shops," e.g., Riggers, Welders, Electricians, as well as temporary

"Projects" that were created to work on specific repair projects, e.g., an overhaul of a submarine.  Ex. H, Werth Supp. Decl. ¶ 3.

14.  Plaintiff was a permanent part of the Rigging Shop (Shop 72).  Ex. H, Werth Supp. Decl. ¶¶ 2, 4.

15.  Plaintiff also was temporarily assigned to Projects.  In a project during 1994, she was a first-level supervisor with the title of Foreman.  Ex. H, Werth Supp. Decl. ¶ 5; Ex. G, Werth Decl. at 1:20.

16.  A General Foreman is one supervisory grade above a Foreman.  Ex. I, Tolbert Decl. at 2:5-8; Ex. H., Werth Supp. Decl. ¶¶ 2, 5, 11, 12.

17.  On August 8, 1994, plaintiff had an incident with General Foreman Joseph Sparks.  During this incident, plaintiff prevented General Foreman Sparks from giving directions to Riggers working under her supervision on a Project; she told Sparks to leave the Project.  Ex. A, Harris Depo. at 66:6, 66:15 - 67:13; Ex. H, Werth Supp. Decl. ¶¶ 13, 14, 17, 20-22.

18.  General Foreman Sparks reported this incident to David Werth, the Superintendent of the Service Group.

19.  Mr. Werth was a senior manager within the MINSY organization, supervising approximately 1,500 employees and multiple Trade Shops, including the Rigging Shop (Shop 72).  Ex. H, Werth Supp. Decl. ¶ 2.

20.  Even when temporarily assigned to a Project, MINSY employees remained connected to their permanent Trade Shop for various purposes, including all disciplinary actions.  Ex. A, Harris Depo. at 72:10-12.

21.  Mr. Werth's responsibilities included discipline for supervisory personnel within the Service Group, including plaintiff.  Mr. Werth did not discipline non-supervisory employees, as that was done at a lower management level.  Ex. H, Werth Supp. Decl. ¶ 32.

22.  After speaking with plaintiff about the incident, Mr. Werth decided that discipline was necessary for plaintiff's inappropriate conduct toward General Foreman Sparks, particularly in light of her refusal during their meeting to acknowledge any responsibility for the incident or any need to change her manner of behavior toward a higher-level supervisor.  Ex. H, Werth Supp. Decl. ¶¶ 20-22.

23.  Mr. Werth imposed a two-day suspension.  Plaintiff filed an administrative EEO complaint based on sex discrimination over this suspension.

24.  Plaintiff presents no evidence that Mr. Werth failed to discipline male supervisors for conduct similar to plaintiff's.

25.  Plaintiff's inappropriate conduct toward a superior is a legitimate nondiscriminatory reason for the suspension.

26.  Plaintiff's unrepentant responses to Mr. Werth's efforts to correct her behavior are a legitimate nondiscriminatory reason for the suspension.

27.  Plaintiff has not produced any evidence that the stated reason for the suspension was pretextual, nor that it was a pretext for sex discrimination.

28.  As part of the administrative EEO proceeding leading to the 2436 suit, plaintiff also alleged sex discrimination regarding two other issues, involving her job assignments and bonuses.  Neither of those issues involved the two-day suspension or Mr. Werth.  Plaintiff chose not to pursue these issues in her judicial complaint.

29.  Plaintiff lately has contended that Mr. Werth's disciplinary decision constituted reprisal for protected activity by Ms. Harris.  Pl.'s Opp'n (docket no. 73 in 2436 case) at 2, ¶ 3; 26:7-12; 38:13 - 39:12; 46:19 - 47:8.

30.  There is no evidence that plaintiff pursued, or that the EEOC accepted, reprisal as a basis in the MINSY administrative EEO proceeding.  See 2436 Compl., Attach. (Navy right-to-sue notice in the Mare Island administrative EEO proceeding, Navy number 95-00221-014).  Although plaintiff argues acceptance of a reprisal issue in

5

the MINSY administrative proceeding based on her Exhibits 69 and 128, those were in the Puget not the MINSY administrative proceeding, and thus not relevant to the 2436 case.

31.  Exhibit 129 is the written EEO complaint in the MINSY administrative proceeding. It does not mention reprisal.

32.  Exhibit 113 is a belated request to the EEOC administrative judge to add reprisal to the MINSY proceeding.  There is no evidence that plaintiff or her attorney ever pursued that request further.

33.  Once an EEOC administrative judge has been appointed, as had happened when this late request was made, only the administrative judge may accept a change in the complaint.  See 29 C.F.R. § 1614.109(a).  From the EEOC decision, administrative judge Leach did not accept the change proposed by plaintiff's attorney.  Ex. N-1.  The final decision by the Navy that adopted the EEOC decision, attached to the complaint in the 2436 case, did not include reprisal discrimination as an accepted basis.

34.  Plaintiff's EEO complaint was the only EEO complaint ever filed against Mr. Werth.  Ex. H, Werth Supp. Decl. ¶ 23.

35.  More than one-and-a-half years after the suspension, in 1996, as MINSY was about to close, the Shipyard Commander, although making no finding of discrimination, sought to make a "good faith effort" to resolve the matter before base closure.  He ordered the cancellation of the two-day suspension, removal of any record of the two-day suspension, restoration of plaintiff's pay for those two days, and a retroactive temporary promotion with back pay of over $3,000.  Ex. L, Letter from Commanding Officer, Mare Island Naval Shipyard.

/////

/////

/////

36.  Plaintiff concedes this action made her whole except for one outstanding claim.  Plaintiff claimed at that time she had been removed from the DOD PPP registry for nine months because of the discipline.  2436 Compl. at 9, ¶ 63; Pl.'s Response to DSUF (Def't's Statement of Undisputed Facts) ¶ 15 (docket no. 74 in 2436 case).

37.  DOD PPP records establish that plaintiff was removed from the DOD PPP registry not for nine months, as she once mistakenly contended, but for approximately one month, from May 24, 1995, to June 26, 1995.  Ex. B, Wooley Decl. at 1:19 - 2:6; Ex. D, Watson Super. Decl. ¶¶ 32-33.

38.  Plaintiff recently modified her claim to say the Human Resource Office at MINSY simply marked her file to prevent her selection without informing the DOD PPP.  The MINSY HRO employee to whom this action is attributed, Carmen Merriman, denies this.  See Ex. P, Merriman Decl. ¶¶ 5-6.

39.  Plaintiff's claim that two documents were used to mark her file is supported by no evidence.  To the extent plaintiff attempts to support it, she is without personal knowledge.  The uncontroverted evidence is that the documents were not used for that purpose at all.  See id. ¶ 7.

40.  None of the evidence of record creates a material issue of fact, because (1) it is DOD that refers applicants directly to the requisitioning activities, (2) plaintiff's resume was in fact being referred during the nine month period, and (3) selections are made by the hiring activity, and not MINSY, and then reported to the DOD PPP office.  Ex. M-7, DOD PPP Referral History; Ex. D, Watson Super. Decl. ¶¶ 32-33; Ex. P, Merriman Decl. ¶¶ 6, 8.

41.  Accordingly, the HRO at MINSY could not have prevented referral or selection under the DOD PPP direct referral process.  The only action that would have prevented referral and selection was if plaintiff had been deleted from the DOD PPP registry.

1      42.  As found above, plaintiff was deleted from the DOD PPP registry from

2  May 24 to June 26, 1995.

3      43.  Plaintiff asserts her temporary deletion from the PPP as a result of the two-day

4  suspension "might keep me from obtaining another job."  Ex. 2 at 7:2 (docket no. 66-1).

5  Although MINSY closed in April 1996, plaintiff remained employed by the Navy for

6  more than three years after that date.  Plaintiff was selected for an assignment on the Post

7  Closure Detachment, the small team that did all the final tasks to close the base

8  permanently.  Plaintiff was separated September 13, 1999.  Pl.'s Opp'n at 29:22-24

9  (docket no. 73 in 2436 case).

10     44.  Plaintiff's claims of "might keep me from obtaining another job" is weak

11 because she found Navy work for another three years and because she was removed from

12 the PPP for only a month.  Before that month plaintiff was registered for jobs only in

13 California, and after it only for a few local activities near MINSY for about three months.

14 Ex. M-13.  Plaintiff admits there were no trade positions open in Mare Island area

15 because of base closures.  See Pl.'s Response to DSUF ¶ P27 (docket no. 74 in 2436

16 case).  From any viewpoint, the likelihood of a job becoming available in plaintiff's

17 geographical area of availability during that one month was small.

18     45.  The court finds plaintiff has demonstrated no harm in the 2436 suit aside from

19 the potential loss of re-employment opportunity caused by plaintiff's deletion from the

20 PPP registry from May 24 to June 26, 1995.  This deletion took place more than four

21 years before plaintiff's separation from federal employment.

22     D.    The Puget Claim

23     46.  Plaintiff's Puget suit is based on her rejection for a position at the Puget Sound

24 Naval Shipyard, Bremerton, Washington (Puget).  The rejection took place in January

25 1996, under the hiring rules established by the DOD PPP, including the Expanded

26 Voluntary Separation Incentive Program, Phase II, discussed below.

47.  There is no dispute plaintiff was eligible for DOD PPP registration, and was registered in the PPP, continuously from June 26, 1995, until April 2, 1997.  Ex. M-13. In particular, she was registered from November 1995 to January 1996, the time period of the Puget claim.

48.  To be referred for consideration for a vacant position under the DOD PPP, an employee must, among other conditions, (1) have been registered with the DOD PPP and (2) have elected to include the location of the vacant position or positions within the employee's "area of availability."  The DOD PPP requisition and referral process is fully automated, and an employee's resume will not be referred for consideration for any position that is located outside the geographic area the employee has chosen to designate. Ex. D, Watson Super. Decl. ¶¶ 31-32.

49.  Although plaintiff had been on the PPP registry for some time, plaintiff first amended her area of geographic availability to include Washington State, the area that includes Puget, on October 31, 1995.  This amendment took effect the following day, November 1, 1995.  Ex. M-13.

50.  Based on the effective date of this amendment, plaintiff now admits she first became an applicant for a position at Puget as of November 1, 1995.  Pl.'s Opp'n at 47:17-19, 48:15-17, 53:22, 54:23-25 (docket no. 73 in 2436 case).

51.  Shortly after plaintiff amended her area of geographic availability to include Puget, the Human Resources Office at Puget submitted a requisition for resumes to the DOD PPP.  This requisition was submitted under what is known as the Expanded Voluntary Separation Incentive Program, or the Voluntary Separation Incentive Program, Phase II (EVSIP II).

E.    EVSIP II

52.  EVSIP II is a DOD program derived from the Voluntary Separation Incentive Program (VSIP), a civil-service-wide program, and from the DOD PPP.

53.  EVSIP II is a specialized program under the DOD PPP that has a different set of DOD-prescribed rules from either the DOD PPP or the VSIP.  EVSIP II is intended to expand the employment opportunities for employees on the DOD PPP registry.  Instead of passively awaiting vacancies, facilities under the EVSIP II program are encouraged to "create" vacancies by giving current employees an incentive to leave their position to make a position available to an employee waiting on the DOD PPP registry for a vacancy. Ex. C, Wooley Depo. at 35:6 - 36:4.

54.  The EVSIP II program tasks DOD facilities not undergoing a RIF to "canvas" their employees to see if any employee would be willing to retire if given a monetary bonus, usually $25,000.  The term "retire" is used for simplicity because the vast majority of EVSIP II cases involve employees who are retirement eligible and who agree to retire early.  Technically, employees can choose to vacate their positions under EVSIP II even though they are not yet eligible to retire.  The source of the incentive bonus money is the separation bonus money that employees who lose their positions because of RIF are entitled to receive.  Under EVSIP II the employee agreeing to vacate a position voluntarily (employee 1) and the PPP registrant placed into a vacancy (employee 2) "swap" entitlements.  Ex. C., Wooley Depo. at 22:22-23:13; Ex. 10.  The PPP registrant (employee 2) gives up entitlement to the separation bonus in exchange for being placed; the departing employee (employee 1), for creating a vacancy by retiring early, receives the monetary bonus that would have been paid to the PPP registrant (employee 2).  If there is no qualified PPP registrant to take the vacancy, then there is no incentive bonus for the departing employee and the voluntary retirement is cancelled.  Id.

55.  Under EVSIP II a vacancy never occurs unless a PPP registrant can be placed into a position.  Ex. 10.

56.  The EVSIP II has another incentive for DOD facilities to utilize the program, in that it allows for "workforce shaping."  Ex. D, Watson Super. Decl. ¶ 5.

57.  A DOD activity is allowed to requisition for a different position than the one being vacated.  Ex. M, Wooley Supp. Decl. ¶¶ 37-45.  For example, if a DOD facility had too many welders and not enough electricians, it could allow a welder to retire voluntarily with the incentive bonus, and then fill a new electrician position instead of the welder position, with the electrician position being filled by a DOD PPP registrant.

58.  That also is true for grade level.  A DOD facility is permitted to allow a supervisor to retire and then fill a new position at a non-supervisory level, again, only with a PPP registrant.  By benefitting the participating DOD facility, this option encourages greater use of EVSIP II, thereby placing more PPP registrants.  Id.

59.  There are more differences between the normal DOD PPP process and EVSIP II.  The most important remaining difference is that unlike the normal DOD PPP referral process, a hiring activity is never required to hire an employee holding a higher permanent grade than the grade of the vacant position.

60.  Because of "grade retention" rights, placing an employee with a higher permanent grade than the position being filled would create an expense to the hiring activity additional to the incentive bonus expense already being paid.  Anticipating that this added cost would likely dissuade DOD facilities from using EVSIP II, DOD revised the normal DOD PPP rules for EVSIP II.  Ex. C, Wooley Depo. at 22:6 - 23:10; 34:1-9; 35:6-36:4, 47:1-15.

61.  Under EVSIP II, the only employees who must be selected are those who exactly match the requisition as to pay plan, job series and pay grade.  Ex. D, Watson Super. Decl. ¶¶ 8, 10, 11.  Such a match also is known as a "perfect match."  Id. ¶ 10. Employees with "grade retention," such as employees holding a permanent grade with a higher pay plan, may be hired as a matter of discretion, but hiring them is never mandatory.  Id. ¶ 8.

/////

1    62.  Because hiring employees who exactly match is mandatory, discretionary

2  hiring can occur only if there are more vacancies than there are employees who exactly

3  match the vacancy.  Id.

4         F.     Plaintiff's Rejection for Puget Rigger Vacancies

5    63.  An EVSIP II requisition, VSIP 008, was in the process of closing when

6  plaintiff expanded her area of geographic availability effective November 1, 1995.

7  However, that requisition had been "V" coded by the Human Resource Office at Puget to

8  screen out all non-exact matching resumes.  On a "V" coded requisition the DOD PPP

9  would send only exact match resumes.  That process is permitted under EVSIP II because

10  only exact-match employees are mandatory hires.  As shown by the DOD PPP referral

11  history, plaintiff was not referred under VSIP 008, and Puget received nothing about her.

12  Ex. M-7, DOD PPP Referral History.

13    64.  After plaintiff amended her area of geographic availability to include Puget,

14  effective November 1, 1995, the Human Resource Office at Puget made a requisition

15  under the EVSIP II program for three vacancies at the nonsupervisory Rigger level, WG-

16  5210-10.  This requisition was identified as VSIP 009.  Because this was an EVSIP II

17  requisition, these were "vacancies" only because three employees had agreed to retire if

18  they became eligible for the separation incentive bonus.  Ex. 10.

19    65.  Because Puget had not been able to fill all of the WG-5210-10 Rigger

20  vacancies using VSIP 008, the Human Resource Office elected not to "V" code the next

21  requisition, VSIP 009, so that it would see more resumes, even non-mandatory hires.

22  This decision allowed both plaintiff's and Roger Tyrrell's resumes to be referred even

23  though neither was a mandatory hire.

24    66.  The DOD PPP sent six resumes to Puget in response to the VSIP 009

25  requisition.  The Human Resource Specialist at Puget who was responsible for this hiring

26  process was Theresa Watson.  In January 1996, Ms. Watson reviewed the six resumes,

concluded that one male applicant did not qualify, and then proceeded to review the five qualified applicants.

67.  The five qualified applicants were examined to see which resumes, if any, were mandatory hires under the EVSIP II.  There were three permanent WG-5210-10 employees who were exact matches for the three vacant positions.

68.  Ms. Watson offered the positions to the three employees who exactly matched the vacancies because they were mandatory hires under EVSIP II.  Ex. D, Watson Super. Decl. ¶¶ 9-10.  The three employees selected were male.

69.  If there had been more vacancies than exact matches, or if one or more of the three mandatory hires had rejected the job offer, then the other two employees, whose resumes did not exactly match the requisition, could have been considered as discretionary hires.  Ex. D, Watson Super. Decl. ¶¶ 26-27.  But all three job offers were accepted, and those acceptances filled all available vacancies.

70.  Ms. Watson returned the remaining two resumes to the DOD PPP marked as being considered, but "placement would result in grade retention."  This was a reference to the fact that these two resumes were not an exact match to the vacant positions.  These two rejected employees were plaintiff and Roger Tyrrell, both holding permanent grades higher, by virtue of higher pay plans, than the vacant positions.  Id. ¶ 26.

71.  When notified of her rejection, plaintiff filed an administrative EEO Complaint identifying sex discrimination and reprisal (for her earlier EEO complaint filed at MINSY) as the two bases for her complaint.

G.    Additional Claims

72.  Late in the 2436 and Puget suits, plaintiff sought to add certain claims.  See Pl.'s Opp'n at 32:1-6, 47:9 - 48:4, 60:3 - 62:8, 66:23 - 67:16, 68:17 - 71:15 (docket no. 73 in 2436 case).

/////

73. The first such added claim is that the MINSY suspension was unlawful on an additional basis, reprisal for Title VII-protected activity.

74. As noted above, no MINSY reprisal claim was exhausted in the MINSY EEO proceedings. Plaintiff has not shown that she brought such a claim to the attention of the EEO counselor, that she included it in her written claim of discrimination, Ex. 129, that it was accepted for investigation, that she pursued it despite a refusal to add, or that it was decided in the final administrative order attached to the complaint initiating the 2436 suit. See ¶¶ 29-33 supra.

75. The MINSY reprisal claim is not like or reasonably related to the MINSY sex discrimination claim.

76. On the merits of the MINSY reprisal claim, plaintiff has presented no evidence that she engaged in activity protected by Title VII before she was notified of the proposed suspension.

77. While plaintiff refers to a decision by a subordinate of Mr. Werth to select Lonnie Hill for personnel action, and to an unspecified protest by her against that decision, she fails to show how one in Mr. Werth's position might plausibly have a motive to retaliate against her.

78. As found above, defendant articulated a legitimate, nondiscriminatory reason for the suspension, and plaintiff has failed to present any evidence that the reason was pretextual.

79. Plaintiff has failed to adduce any evidence that the suspension was retaliatory.

80. In the Puget suit, plaintiff seeks to add a claim that she should have been hired to fill one of a large number of positions at Puget allegedly occurring after January 1996.

81. That claim was not exhausted in the Puget EEO proceedings. Plaintiff has not shown she brought such a claim to the attention of the EEO counselor, that she included it

/////

1  in her written claim of discrimination, that it was investigated, or that it was decided in

2  the final administrative order attached to the complaint initiating the 2440 suit.

3      82.  That claim is not like or reasonably related to the claim of discrimination in

4  the selection in January 1996.

5      83.  On the merits, despite being registered in the DOD PPP, plaintiff was not

6  referred for any vacancy occurring after January 1996, with the immaterial exception of

7  one seasonal position.

8      84.  Plaintiff has adduced no evidence that she was referred for any of the lately

9  claimed positions.  She was not an applicant within the meaning of McDonnell Douglas

10  Corp. v. Green, 411 U.S. 792, 802-04 (1973).

11  II.  CONCLUSIONS OF LAW

12      A.  Evidentiary and Procedural Objections

13  Defendant objects to various evidence cited by plaintiff as hearsay.  See Docket

14  no. 81-2 at pdf pages 6, 16 (case 2436) ¶ R5 (objecting to Jan Hill's unsworn notes saying

15  that Mr. Gadson said Mr. Sparks spoke the first foul words in the Sparks-Harris incident),

16  ¶ R24 (objecting to a statement by Ms. Cannon about a statement by Ms. Merriman about

17  plaintiff's temporary deletion from the PPP), ¶ R25 (objecting to a declaration to the same

18  effect by Ms. Cannon).  These objections are sustained.

19  Defendant objects to two filings in the 2436 case on the day of the hearing – see

20  docket nos. 82 (containing Exhibits 120-28) & 83 (containing 40 pages of argument) –

21  because the local rules do not authorize a reply to a reply. This objection is overruled.

22  The court takes note of the filings, assigning them appropriate weight.  Generally they are

23  not material to determination of the motions.

24  /////

25  /////

26  /////

B.     Defendant's Motion for Partial Dismissal

Defendant has moved, as a threshold matter, to dismiss two of plaintiff's claims he says plaintiff either first raises, or first asserts in a recognizable way, in her motion for summary judgment.  Leaving aside the question of whether a plaintiff may raise new substantive claims in a motion for summary judgment, defendant asserts the claims should be dismissed for failure to exhaust administrative remedies.  Also, defendant moves now for dismissal of plaintiff's entire MINSY claim for mootness, based on an assertion of judicial admissions made by plaintiff in her most recent pleading.

1.     Standard for Dismissal under Fed. R. Civ. P. 12(b)(1) and (h)(3)

When considering dismissal for lack of jurisdiction, "the trial court may proceed as it never could under Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 56."  Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp., 594 F.2d 730, 733 (9th Cir. 1979).  The Ninth Circuit has repeatedly approved of "speaking motions" that challenge jurisdiction based on facts established by evidence.  See, e.g., Trentacosta v. Frontier Pac. Aircraft Indus., 813 F.2d 1553, 1558-59 (9th Cir. 1987).

> Unless the existence of jurisdiction depends on the merits,
> [n]o presumptive truthfulness attaches to plaintiff's
> allegations, and the existence of disputed material facts will
> not preclude the trial court from evaluating for itself the
> merits of jurisdictional claims.  Moreover, the plaintiff will
> have the burden of proof that jurisdiction does in fact exist.

Thornhill, 594 F.2d at 733; Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir. 1983).  Such motions are subject to summary judgment standards only if jurisdiction and the merits are "intertwined," id., in the sense that "the question of jurisdiction is dependent [upon] the merits."  Berardinelli v. Castle & Cooke, Inc., 587 F.2d 37, 39 (9th Cir. 1978).

/////

/////

16

1              2.    Administrative Exhaustion

2        The first of the purportedly new claims arises in the 2436 suit.  Plaintiff's

3   contention is that when Mr. Werth imposed the two-day suspension on her in September

4   1994, he was motivated not only by sex discrimination, the basis identified in plaintiff's

5   administrative EEO complaint, but also by reprisal for prior EEO activity.  See Pl.'s

6   Opp'n at 2, ¶ 3, 26:7-12, 38:13 - 31:12, 46:19 - 47:8 (docket no. 73 in 2436 case).

7        The second new claim by plaintiff arises in the Puget suit.  In it, plaintiff contends

8   her complaint against Puget is not only for the one non-selection by Teresa Watson in

9   January 1996, the subject of her administrative EEO complaint, but also for numerous

10  other asserted selections for positions plaintiff believes should have been offered to her

11  under her interpretation of the internal DOD PPP rules.  Plaintiff now claims these

12  selections were or should have been made at Puget later in 1996, in 1997, and perhaps

13  into "perpetuity."  See Pl.'s P.&A. in Supp. Summ. J. at 44-49 (docket no. 66-1 in 2436

14  case); Pl.'s Opp'n at 32:1- 6, 47:9 - 48:4. 60:3 - 62:8, 66:23 - 67:16, 68:17 - 71:15 (docket

15  no. 73 in 2436 case).  Plaintiff claims Puget violated numerous DOD PPP rules to her

16  detriment.

17       Defendant argues plaintiff did not exhaust her administrative remedies for either

18  the new MINSY reprisal claim or the new Puget claim for other unspecified non-

19  selections, and therefore that this court lacks subject matter jurisdiction over these claims

20  under Federal Rule of Civil Procedure 12(b)(1).  Plaintiff argues both of these claims

21  were "accepted and exhausted" at the administrative level.

22       The two suits before the court are brought under the federal employment provision

23  of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16.  Under this provision

24  of Title VII, a claimant must exhaust her administrative remedies.  Exhaustion requires,

25  inter alia, a consultation with an EEO counselor within 45 days of the act alleged to be

26  discriminatory.  29 C.F.R. § 1614.105(a).  "Failure to comply with this regulation is 'fatal

17

1  to a federal employee's discrimination claim.'" <u>Cherosky v. Henderson</u>, 330 F.3d 1243,

2  1245 (9th Cir. 2003) (<u>citing</u> <u>Lyons v. England</u>, 307 F.3d 1092, 1105 (9th Cir. 2002)).

3       An examination of the administrative record, evidenced primarily by the "right to

4  sue" letters attached to the 2436 and 2440 complaints, shows plaintiff did not raise either

5  of her new claims in consultation with an EEO counselor as required by federal

6  regulation.  Neither did she amend her administrative complaint in any manner sufficient

7  to have the amendments "accepted and exhausted" as part of the administrative

8  determination of her EEO complaints.

9       The definitive descriptions of the accepted and exhausted claims are found in the

10  final administrative actions that conclude the administrative EEO complaint process.  In

11  the MINSY proceeding, because plaintiff chose not to appeal to the full EEOC, a final

12  agency decision by the Navy was the final administrative action.  That decision letter is

13  attached to plaintiff's 2436 complaint and identified as her right to sue letter.  <u>See also</u>

14  Ex. N-2.  The letter defines the basis of the complaint, and would have identified reprisal

15  as a basis if reprisal had been accepted and exhausted as part of the administrative

16  complaint process.  It does not identify reprisal:

17                 You claimed you were discriminated against based on your
               sex (female) when:

18

19                    (1) On September 27 and 28, 1994, you were
               suspended for allegedly disrespecting a General Foreman in
               the Rigging Shop on August 8, 1994, which was inconsistent

20                 with that given to male co-workers.

21                    (2)  You were not afforded the opportunity to obtain
               experience as a General Foreman in the Rigging Shop after

22                 you received your rating for the position on December 13,
               1991.

23

24                    (3)  During 1992 and 1993, you were passed over for
               consideration for the alleged $1,500 end of year performance
               award given to many Foremen and General Foremen in the

25                 Rigging Shop.

26  <u>Id</u>. at 1.

1    Likewise, in the Puget administrative proceeding, in which plaintiff appealed to

2 the full EEOC, the final step in the administrative complaint process was the EEOC

3 decision identified as plaintiff's right to sue letter and attached to the 2440 complaint.

4 This decision contains all matters accepted for investigation and exhausted by plaintiff in

5 the Puget EEO proceedings.  It contains no reference to any non-selection after January

6 1996.  The EEOC decision describes plaintiff's Puget claim as follows:

7           Complainant alleged that the agency discriminated
           against her based on sex and reprisal when she was not
8           selected for transfer from the Mare Island Naval Shipyard to
           the position of Rigger, WG-5210-10, at the Puget Sound
9           Naval Shipyard under the Priority Placement Voluntary
           Separation Incentive Program, during the period
10          November 20, 1995, through January 25, 1996.

11 2440 Compl., Attach. (EEOC Decision, Appeal No. 01A22147); <u>see also</u> Ex. N-4.  The

12 EEOC, having access to the full administrative record, found no claim as to any non-

13 selection after January 1996.

14    Defendant further asserts while some amendment subsequent to the administrative

15 complaint is permitted, plaintiff cannot add these new complaints to her district court

16 action unless the complaints are "like or reasonably related" to the complaints that were

17 administrative exhausted.  <u>See</u> <u>Leong v. Potter</u>, 347 F.3d 1117, 1122 (9th Cir. 2003).

18 Defendant asserts that because plaintiff is arguing in the 2436 suit an entirely new basis

19 for discrimination, it is not "like or reasonably related."  <u>Rodriguez v. Airborne Express</u>,

20 265 F.3d 890, 897 (9th Cir. 2001) ("It would not be proper to expand the claim as

21 Rodriguez asks, when 'the difference between the charge and the complaint is a matter of

22 adding an entirely new basis for the alleged discrimination.'" (citing <u>Okoli v. Lockheed</u>

23 <u>Technical Operations</u>, 36 Cal. App. 4th 1607, 1615, 43 Cal. Rptr. 2d 57 (1995)).

24    Adding an entirely new basis for plaintiff's complaint of discrimination at MINSY

25 would dramatically change the nature of the complaint, even though the underlying event,

26 here the two-day suspension, would remain the same.  A new basis for plaintiff's EEO

complaint would so change the focus of the complaint as to render the entire

administrative complaint process inapplicable, and defeat the purpose of the prerequisite

of administrative exhaustion required by Title VII for district court jurisdiction.  The

motion to dismiss the assertion of reprisal at MINSY will be granted.

In the Puget suit, plaintiff brings a plethora of novel claims, including dozens of

job positions to which she asserts hiring rights. These claims, however, are wholly

unrelated to her original complaint that she was non-selected in January 1996, the only

instance in which she can be said to have "applied" for a position at the Puget Sound

Naval Shipyard.[1]

The attempt to change an administrative EEO complaint and suit on one non-

selection – a decision made by Personnel Specialist Theresa Watson in January 1996 –

into a claim of non-selections for dozens of positions over a two or more year period,

involving selection decisions made by unknown and unspecified federal employees, and

based on unknown or unspecified reasons, runs afoul of the "like or related" doctrine.

The purpose of the administrative exhaustion requirement is to require the

employee and the employing federal agency fully to address the complaint and to seek

appropriate resolution before it becomes a matter for district court.  This cannot be done

if the plaintiff fails to raise significant aspects of her complaint.  The motion to dismiss as

to all issues not set forth in the right to sue letters will be granted.

/////

/////

---

[1] Plaintiff's resume was referred to Puget only two times.  The first was on November 14, 1995, in response to VSIP 009.  The second was in March 3, 1997, in response to a requisition for a seasonal position.  Defendant has presented evidence that plaintiff was offered the seasonal job but declined it.  Ex. D, Watson Super. Decl.  ¶¶ 19-21.  Plaintiff denies receiving the job offer.  The 1997 requisition and offer are immaterial to any claim being pressed by plaintiff, in that plaintiff makes no claim related to this position.  Plaintiff goes so far as to say, reasonably, that she would have rejected the job had she received the offer because it was not a full-time position.

3.   Mootness

Defendant asserts that because plaintiff does not challenge Puget's hiring before November 1, 1995, her MINSY suspension claim is now moot and must be dismissed for lack of subject matter jurisdiction. The federal Constitution limits federal courts' jurisdiction to "cases" and "controversies." U.S. Const. art. III.  The mootness doctrine flows from that limitation, for an action that once presented a "case" or "controversy" can lose that live quality and become moot.  For a case to remain live, there must be a "prospect of immediacy and reality" that the relief prayed for will have an effect upon the plaintiff.  DeFunis v. Odegaard, 416 U.S. 312, 320 n.5 (1974).  When a case becomes moot, the court must dismiss it for lack of subject matter jurisdiction.  Id.

Defendant asserts he previously lacked definite word on whether plaintiff claimed a right to be hired at Puget for vacancies occurring before she included Washington State in her area of availability, that is, before her registration on October 31, 1995, effective November 1, 1995.  Defendant also asserts, however, plaintiff has answered that question in the negative in her latest papers filed in this court.  Defendant points to the following statements by plaintiff:  "The claims in Plaintiff's suit encompass all hiring of non-supervisory Riggers and Rigger Supervisors at Puget Sound Rigging Shop beginning November 1, 1995 at which time Plaintiff was registered for their activity through the time Plaintiff fell off the PPP or April 1, 1997."  Pl.'s Opp'n at 47:17-19 (docket no. 73 in 2436 case).  "Plaintiff believes she has established a prima facie claim of discrimination under McDonnell Douglas for all requisitions for non supervisory and Rigger Supervisor positions Plaintiff was registered on the DOD PPP after the November 1, 1995 date through April 1, 1997."  Id. at 48:15-17.  Plaintiff "applied beginning November 1, 1995." Id. at 53:22.  "Plaintiff applied . . . for the Puget Sound area beginning October 31, 1995 through April 1, 1997."  Id. at 54:23-25.  Defendant asserts that as a consequence of this
/////

21

1   latest clarification of her Puget claims, plaintiff would gain nothing by a finding of

2   discrimination in her two-day suspension.

3          As plaintiff has admitted, defendant argues, every consequence of the MINSY

4   two-day suspension has been erased except for her brief deletion from the DOD PPP.

5   Def't's P.&A. in Supp. Summ. J. at 11-12.  That deletion ran from May 24 to June 26,

6   1995.  The slim chance that plaintiff might have been referred and hired under the DOD

7   PPP during that one-month period was the only arguable remaining difference that a

8   judgment of discrimination in the suspension could make to her.  Now that plaintiff

9   disavows any claim for PPP hiring prior to her application at Puget effective November 1,

10  1995, defendant argues, the question of discrimination vel non in her suspension has no

11  consequence for her at all.  Plaintiff has not responded to the mootness argument.

12         On the record before it, the court finds plaintiff has admitted she first became an

13  applicant for any position at Puget on November 1, 1995.  However, the claim for a

14  remedy for the alleged MINSY discrimination is evaluated not as an independent

15  discrimination claim under the McDonnell Douglas allocation of burdens but as an item

16  of damage.  Evaluating the one-month deletion in that manner, the court discerns a very

17  slim remedial claim remaining in the 2436 suit.

18         The remedial claim is that, but for the one-month removal from the PPP registry,

19  plaintiff would have remained registered in the PPP for positions that might have arisen

20  in California.  Plaintiff was registered for an area of availability that included just

21  California at the time she was deleted from the DOD PPP on May 24, 1995.  Although

22  plaintiff has admitted there were no positions available in the commuting area around

23  MINSY, there still was some theoretical chance, however slight, of a position opening up

24  elsewhere in California.  See Pl.'s Response to DSUF ¶ 27 (docket no. 74 in 2436 case);

25  Def't's Response to Pl.'s SUF ¶ 30 (docket no. 71-3 in 2436 case).  On that basis, the

26  /////

1  court finds plaintiff's MINSY suit is not legally moot, and the motion to dismiss for

2  mootness will be denied.

3      C.    Cross-Motions for Summary Judgment

4      The court next turns to the cross-motions for summary judgment.  Plaintiff's

5  motion will be denied and defendant's motion granted for the reasons discussed below.

6          1.    The Standard for Summary Judgment under Fed. R. Civ. P. 56(c)

7      Federal Rule of Civil Procedure 56(c) allows a district court to grant summary

8  judgment "if the pleadings, depositions, answers to interrogatories, and admissions on

9  file, together with the affidavits, if any, show that there is no genuine issue as to any

10  material fact and that the moving party is entitled to a judgment as a matter of law."  Id.

11      "[T]he mere existence of some alleged factual dispute between the parties will not

12  defeat an otherwise properly supported motion for summary judgment; the requirement is

13  that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc.,

14  477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is material if it affects the

15  outcome of the lawsuit under the governing law.  Id. at 248. An issue of material fact is

16  genuine "if the evidence is such that a reasonable jury could return a verdict for the

17  nonmoving party."  Id.

18      Additionally, Rule 56(e) requires that the nonmoving party "go beyond the

19  pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and

20  admissions on file,' designate 'specific facts showing that there is a genuine issue for

21  trial.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (citations omitted).  Inferences

22  from the underlying facts must be viewed in the light most favorable to the party

23  opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

24  586 (1986).  The party opposing summary judgment "must do more than simply show that

25  there is some metaphysical doubt as to the material facts."  Id.

26  /////

23

1   Conclusory "general averments" in affidavits are not sufficient, and "[i]t will not

2   do to 'presume' the 'missing facts.'"  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888-89

3   (1990). The Ninth Circuit "has refused to find a 'genuine issue' where the only evidence

4   presented is 'uncorroborated and self-serving' testimony."  Villiarimo v. Aloha Island Air,

5   Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) (citing Kennedy v. Applause, Inc., 90 F.3d

6   1477, 1481 (9th Cir. 1996)).

7                    2.    The Title VII Standard for Disparate Treatment

8          Title VII of the Civil Rights Act of 1964, made applicable to federal employment

9   by 42 U.S.C. § 2000e-16, prohibits federal agencies from treating employees or applicants

10  for employment disparately on bases including sex and reprisal for Title VII-protected

11  acts.  42 U.S.C. §§ 2000e-2(a)(1) (sex), 2000e-3(a) (reprisal).  A plaintiff in a disparate

12  treatment suit has the burden of persuading the trier of fact that the defendant

13  intentionally discriminated against her.  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S.

14  248, 253 (1981).  A plaintiff must, therefore, prove discriminatory motive by the

15  defendant.  Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977).

16  Absent direct evidence of discrimination, a plaintiff in a disparate treatment case is

17  required to establish as her prima facie case some set of facts "adequate to create an

18  inference that an employment decision was based on a[n] [illegal] discriminatory

19  criterion," O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996) (quoting

20  Teamsters, 431 U.S. at 358).  A plaintiff is required to show she was denied some

21  opportunity that she was qualified for in favor of a person not of the protected class, or

22  that some adverse action was taken against her that affected the terms and conditions of

23  her employment and, as to the specific act complained of, that similarly situated

24  employees not of a protected class were not subjected to the same adverse action.  See

25  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973); St. Mary's Honor

26  Center v. Hicks, 509 U.S. 502, 506 (1993); United States Postal Serv. Bd. of Governors v.

1    Aiken, 460 U.S. 711 (1983); Brown v. Brody, 199 F.3d 446, 451 (D.C. Cir. 1999); Seely

2    v. Runyon, 966 F. Supp. 1060, 1063 (D. Utah 1997), aff'd, 166 F.3d 348 (10th Cir. 1998).

3    Although an adverse employment action can be something besides an ultimate

4    employment decision such as hiring, firing or wage reduction, a plaintiff must at least

5    show an action that "affects the terms, privileges, duration, or conditions of employment."

6    Seely, 966 F. Supp. at 1063 (internal quotations omitted). If the plaintiff establishes a

7    prima facie case, the burden shifts to the defendant to rebut the presumption of

8    discrimination by articulating a "legitimate, nondiscriminatory reason" for the decision at

9    issue. St. Mary's Honor Center, 509 U.S. at 506-07; Burdine, 450 U.S. at 254.  It is

10   important to note, however, that although the McDonnell Douglas presumption shifts the

11   burden of production to the defendant, "'[t]he ultimate burden of persuading the trier of

12   fact that the defendant intentionally discriminated against the plaintiff remains at all times

13   with the plaintiff.'"  St. Mary's Honor Center, 509 U.S. at 518 (quoting Burdine, 450 U.S.

14   at 253).  If the defendant articulates a legitimate, non-discriminatory reason for his

15   employment action, the plaintiff must prove that the proffered reason was a "pretext for

16   discrimination."  Id. at 516.  In other words, plaintiff must provide competent evidence

17   that the presumptively valid reasons for the defendant's actions were "in fact a coverup

18   for a . . . discriminatory decision."  Id. at 805; see also Brown v. Sierra Nevada Mem.

19   Miners Hosp., 849 F.2d 1186, 1192 (9th Cir. 1988).  The defendant's proffered reason

20   "cannot be proved to be a pretext for discrimination unless it is shown both that the

21   reason was false, and that discrimination was the real reason."  St. Mary's Honor Center,

22   509 U.S. at 515 (citations omitted; emphasis in original).

23   /////

24   /////

25   /////

26   /////

25

3.    <u>Plaintiff Has Failed to Produce Evidence to Support a Prima Facie Case That Sex Discrimination Caused Her 2-day Suspension</u>

The test for a <u>prima</u> <u>facie</u> case in this factual context is:

> Under McDonnell Douglas, unlawful discrimination is presumed if the plaintiff can show that "(1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably."

<u>Vasquez v. County of Los Angeles</u>, 349 F.3d 634, 640 n.5 (9th Cir. 2003) (quoting <u>Godwin v. Hunt Wesson, Inc.</u>, 150 F.3d 1217, 1220 (9th Cir.1998) (citing <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802)).

Plaintiff has failed to produce any evidence in response to defendant's motion that similarly situated employees were treated more favorably than she.  In her opposing papers, plaintiff had a final opportunity to make a <u>prima</u> <u>facie</u> case for sex discrimination in her suspension.  The way plaintiff claims to have "proved her prima facie case that sex discrimination caused the suspension" is with the statement, "Defendant has not provided one piece of factual or material evidence that Mr. Werth disciplined other male similarly situated supervisors for misconduct similar to what he believed Plaintiff had committed." Pl.'s Opp'n at 42:7-9, ¶ B(3) (docket no. 73 in 2436 case).

Plaintiff misunderstands the applicable burden of proof.  A plaintiff has the burden of producing evidence to show her <u>prima</u> <u>facie</u> case and, indeed, to sustain her ultimate burden of showing intentional discrimination.  <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802-804; <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 507 (1993).  Therefore it is her burden, not defendant's, to show Mr. Werth did not discipline other male similarly situated supervisors for misconduct similar to what he believed Plaintiff had committed.

As discussed below, the "similarly situated" requirement is strict.  In discipline cases, courts recognize the probability that a manager may have different but legitimate

26

1    concerns about the conduct of different employees.  In this case, from the point of view of

2    the manager, Mr. Werth, plaintiff not only acted inappropriately toward her superior, but

3    when Mr. Werth met with plaintiff face-to-face to discuss her conduct, she refused to

4    acknowledge any responsibility for her actions or to see any reason to act differently in

5    the future.  As described by Mr. Werth, plaintiff "as much as told me that she would do

6    the exact same thing again."  Ex. H, Werth Supp. Decl. ¶ 21.

7        Because plaintiff was a supervisor herself, this apparent failure to appreciate the

8    need to respect the position and authority of her own superior is significant.  This failure

9    is of particular importance in the case, because Mr. Werth made it clear he gave plaintiff

10   more than one chance to accept responsibility and to apologize to General Foreman

11   Sparks, and that he then would have imposed no discipline at all.  Ex. H, Werth Supp.

12   Decl. ¶ 20.  It is reasonable that a supervisor confronted with two employees, both of

13   whom the supervisor concludes have committed the same misconduct, one of whom

14   admits the error and apologizes, with the other refusing to accept any blame, may decide

15   that the second employee requires more discipline to correct the problem.  Thus, a valid

16   comparison between this action and other disciplinary actions by Mr. Werth would

17   require the other similarly situated supervisor also to have refused to accept responsibility

18   for the underlying misconduct.

19       In this case, that scarce occurrence – plaintiff's unrepentant response to the

20   proposed discipline – need not be reached.  Plaintiff has presented no evidence that any

21   male supervisor in an approximately similar situation, that is, viewed as having

22   disrespected a superior, was treated more favorably than plaintiff.

23       Indeed, the only evidence in the record on that question is contrary to what

24   plaintiff must show to prevail.  When asked about his actions after being retired for over a

25   decade, since October 1995, Mr. Werth remembers that he did discipline male supervisors

26   for similar misconduct.  He admits that without the aid of records he generally cannot

remember specifics well enough to describe them under oath, but there are two

exceptions.  He knew of and endorsed an even longer suspension of General Foreman

Sparks for disrespect.  And he remembers disciplining Foreman Mitchell for

inappropriate conduct toward plaintiff.  Werth Supp. Decl., Ex. H, ¶¶ 36, 38-39.

   In contrast, plaintiff has no evidence regarding a male supervisor for comparison

to her treatment.  In arguing she has a prima facie case, Pl.'s Opp'n at 42-44 (docket

no. 73 in 2436 case), plaintiff claims to show "how Plaintiff was treated compared to

similarly situated male employees."  Id. at 43:10.  For that proposition she relies on a

declaration from Penny Hicks.  Id.; see Docket no. 66-6 (Decl. of Penny Hicks at pdf

p. 33).  But that declaration mentions only non-supervisory employees whom the witness

felt should have been but were not disciplined by someone other than Mr. Werth.  Id. at

pdf p. 35.

   The "similarly situated" requirement is necessarily strict.  To show that others who

were treated more favorably had "qualifications similar to her own" under Vasquez,

349 F.3d at 640 n.5, a plaintiff must show they "have similar jobs and display similar

conduct."  349 F.3d at 641 (footnote omitted).  Supervisory and lower level jobs are not

similar.  "Employees in supervisory positions are generally deemed not to be similarly

situated to lower level employees."  Id. (footnote omitted; citing Hollins v. Atlantic Co.,

Inc., 188 F.3d 652, 659 (6th Cir. 1999) (to be similarly situated, an employee must have

the same supervisor, be subject to the same standards, and have engaged in the same

conduct)).

   There is good reason for supervisors to be "held to a high standard," Ex. G, Werth

Decl. at 2:8-9 (docket no. 71-1 in 2436 case), compared with non-supervisors.

Supervisors give direction, both by express order and by their behavior.  Insubordination

by a supervisor sets a bad example for the rank and file and, more than insubordination by

/////

1  a lower level employee, can frustrate the chain of command.  Furthermore, a supervisor is

2  appropriately expected to show good judgment as well as good conduct.

3          The distinction between supervisors and non-supervisors is important to this case

4  in one more way, for discipline of the two groups, supervisors and nonsupervisors, was

5  handled in two different places.  Mr. Werth headed the Service Group, an organization of

6  several Shops and 1,500 employees.  Ex. G, Werth Decl. at 1.  Mr. Werth "would not

7  normally be called upon to discipline a nonsupervisory employee."  Ex. H, Werth Supp.

8  Decl. ¶ 32. "As a Foreman, Ms. Harris was part of management; the question of

9  disciplining her therefore became my concern." Id.

10         Discipline of non-supervisors was handled at a lower level.  The Rigging Shop

11 was one of the Service Group's "many" sub-organizations.  Id. ¶ 2.  Even if there was

12 evidence non-supervisory male employees had been treated more favorably by the

13 Rigging Shop, the non-supervisory employees could not satisfy the "similarly situated"

14 requirement because they did not have similar jobs, nor were they disciplined by the same

15 supervisor.  See Hollins, 188 F.3d at 659.  As noted above, this would be true even

16 without considering plaintiff's apparent lack of contrition that would make a meaningful

17 comparison difficult.  Plaintiff, a supervisor disciplined by Mr. Werth, is unable to point

18 to any supervisor who was not disciplined by Mr. Werth for conduct similar to hers.

19         Furthermore, contrary to plaintiff's claims, the evidence is that, in all his years of

20 service, Mr. Werth was never the subject of an EEO complaint except when plaintiff

21 complained about the disciplinary suspension in 1994.  Ex. H, Werth Supp. Decl. ¶ 23.

22 Mr. Werth supervised about 1,500 employees.  Plaintiff has presented no evidence that

23 Mr. Werth would have reason to have personal antagonism toward her.  His decision to

24 suspend plaintiff for two days, whether right or wrong, was motivated by what appears to

25 be a reasonable belief that plaintiff needed correction.  As he has declared, this belief

26 /////

1  arose primarily based on statements plaintiff herself made when she elected to meet with

2  Mr. Werth personally before he made the disciplinary decision.  Id. ¶¶ 20-22.

3      In summary, plaintiff has not produced evidence that in Mr. Werth's discipline of

4  other supervisors for conduct similar to plaintiff's he favored males.  Therefore plaintiff

5  has failed to produce evidence to support her prima facie case.  The court will grant

6  summary judgment for defendant in the MINSY suit.[2]

7          4.      Plaintiff Lacks a Prima Facie Claim for the Puget Vacancies

8      Plaintiff complains that because of sex discrimination and reprisal, defendant in

9  January 1996 selected three male non-supervisory Riggers, WG-5210-10, and not

10  plaintiff, a female Rigger supervisor, WS-5210-10, for three non-supervisory WG-5210-

11  10 positions at Puget.

12      To set forth a prima facie case of disparate treatment for a failure to hire, a

13  plaintiff must establish that:  (1) she is a member of the protected group; (2) she applied

14  for and was qualified for a job for which the employer was seeking applicants; (3) despite

15  her being qualified, she was rejected; and (4) another similarly situated employee not of

16  her protected group was selected, or after her rejection, the position remained open and

17  the employer continued to seek applicants from persons of complainant's qualifications.

18  McDonnell Douglas, 411 U.S. at 802; Raad v. Fairbanks North Star Borough Sch. Dist.,

19  323 F.3d 1185, 1193 n.6 (9th Cir. 2003).

20      Defendant is correct that plaintiff has judicially admitted she was not an applicant

21  for any position at Puget before November 1, 1995.  Furthermore, the DOD PPP records

22  show plaintiff was referred for a position at Puget only one pertinent time.  That was on

23  November 14, 1995, in response to Puget's requisition VSIP 009, which led to the

24

25      [2]  Because plaintiff fails to adduce evidence of an element of her prima facie case, the court
    need not reach defendants' other arguments with respect to legitimate, nondiscriminatory reasons
26  for the suspension, lack of pretext, and remoteness of harm.

disputed selection in January 1996.  Therefore, even if plaintiff had not admitted it, the court finds with regard to the Puget suit that plaintiff was an applicant only for this one DOD PPP requisition.

The Navy, as both parties agree, is required to follow the DOD PPP hiring regulations when filling a vacancy.  Plaintiff consistently argues Puget was bound by the internal regulations published by the DOD for the hiring of employees registered with the DOD PPP.  These regulations strictly control the referral and selection process used to fill vacancies within DOD facilities.

These regulations have been explained carefully by a subject-matter expert on the DOD PPP rules, nonparty DOD's Steven Wooley. See Exs. B & M.  The one binding policy and procedures directive is the "DOD PPP Manual," officially entitled DOD Manual 1400.20-1-M, "DOD Program for Stability of Civilian Employment Policies, Procedures, and Program Manual."  Ex. M, Wooley Supp. Decl. ¶ 9.  All other DOD publications are non-binding guidance to be applied only if consistent with the DOD PPP Manual.  Id. ¶¶ 8-18.

It is undisputed that a DOD facility hires from the PPP referrals.  Because the record shows plaintiff was referred to Puget on November 14, 1995, she was an applicant for the vacancies at that time.

Another undisputed aspect of the DOD PPP is that a DOD facility must select an employee from the DOD PPP referrals, if any, whose pay plan, job series and grade in some sense "match" the position being requisitioned.  If there is a "match," as variously defined, by one or more referred employees, selection of one of the matching employees is mandatory.

/////

/////

/////

Under the standard DOD PPP process, a "match" is defined to include employees who hold a higher permanent grade than the position being filled.  Under EVSIP II, however, selection is mandatory only when there is a match as to pay plan, job series and grade.  Ex. M, Wooley Supp. Decl. ¶¶ 37-40.

In Puget's January 1996 hiring under VSIP 009, Human Resource Specialist Teresa Watson made three job offers to three male employees because their resumes were an exact match for the three WG-5210-10 vacancies.  The vacancies, requisition and selections were under the EVSIP II process.  Ms. Watson was complying with the DOD PPP EVSIP II hiring rules because selecting an exact match referral was mandatory. There is discretion in the selection in only two circumstances.  First, where there are more exact match referrals than vacancies, then the hiring facility is allowed to examine the resumes for other qualifications, such as schooling or additional skills, to choose among the exact match referrals.  Second, where there are fewer exact match referrals than there are vacancies, then the hiring facility has the discretion to select from non-exact match referrals.

Therefore, Ms. Watson had no discretion to offer the position to plaintiff or to Mr. Tyrrell, both of whom had been referred from the DOD PPP.  Ex. D, Watson Super. Decl. ¶ 7.  Plaintiff and Mr. Tyrrell were in a higher permanent pay group; therefore neither was an exact match for the vacancies.  And there were three exact match referrals for the three vacancies.  Id.  If one or more of the three exact match applicants had declined the job, the declination would have provided Ms. Watson with some discretion, but that did not happen.

Therefore plaintiff, a permanent supervisory employee who did not exactly match the pay plan, job series and pay grade of the vacancies, lacked similar qualifications to those selected for the vacancy.  For this reason, although plaintiff satisfies the "applicant" requirement of McDonnell Douglas Corp., she does not satisfy the "similarly situated"

32

1  requirement.  Plaintiff fails to present evidence sufficient to make a prima facie case.  For

2  that reason, summary judgment will be granted in defendant's favor in the 2436 suit.[3]

3        Accordingly, for the above reasons, THE COURT ORDERS AS FOLLOWS:

4        1.  Defendant's motion to dismiss the assertion of reprisal in the 2436 suit, for lack

5  of subject matter jurisdiction because of lack of administrative exhaustion, is GRANTED.

6        2.  Defendant's motion to dismiss the assertion of claims related to multiple hirings

7  after January 1996 in the 2440 suit, for lack of subject matter jurisdiction because of lack

8  of administrative exhaustion, is GRANTED.

9        3.  All claims not set out in the right-to-sue letters attached to the 2436 and 2440

10  complaints are DISMISSED.

11        4.  Defendant's motion to dismiss the 2436 suit as moot is DENIED.

12        5.  Plaintiff's motion for summary judgment on all claims in both suits is DENIED.

13        6.  Defendant's motion for summary judgment on all claims in both suits is

14  GRANTED.

15        7.  The Clerk shall enter judgment in both suits hereon.

16        8.  Both cases shall be closed.

17        IT IS SO ORDERED.

18  DATED:  September 28, 2007.

19

20  _____
    U.S. MAGISTRATE JUDGE

21

22

23

24  harris.ffcl

25

26  [3]  The court will not address the issue of pretext inasmuch as plaintiff fails to meet her initial
    burden of showing she was similarly situated.

33